**GOOD | GUSTAFSON | AUMAIS LLP**
CHRISTOPHER T. AUMAIS, SBN 249901
CHRISTOPHER B. GOOD, SBN 232722
RYAN GUSTAFSON, SBN 220802
2330 Westwood Boulevard, Suite 103
Los Angeles, California 90064
Telephone: (310) 274-4663
E-mail: cta@ggallp.com
E-mail: cbg@ggallp.com
E-mail: jrg@ggallp.com

**THE KEETON FIRM LLC**
Steffan T. Keeton (*Pro hac vice)*
100 S Commons, Ste. 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Counsel for Plaintiff and the Proposed Class*

GOOD GUSTAFSON AUMAIS LLP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISON

John Forrett, individually, and on behalf of those similarly situated,

Plaintiff,

v.

West Thomas Partners, LLC d/b/a GFB,

Defendant.

CASE NO. 5:22-cv-02048-NC

**CLASS ACTION COMPLAINT**

**Demand for Jury Trial**

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiff John Forrett ("Plaintiff") brings this action, individually and on behalf of all others similarly situated, against Defendant West Thomas Partners, LLC d/b/a GFB ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

GOOD GUSTAFSON AUMAIS LLP

## NATURE OF THE ACTION

1. This case arises out of Defendant's deceptive, misleading, and unlawful practices with respect to its marketing and sale of its GFB Gluten Free Bites which are sold in a variety of flavors (collectively, the "Product" or "Products").[1]

2. Defendant manufactures and sells its Products throughout the United States in a variety of physical and e-commerce stores.

3. Consumers are increasingly health conscious and, as a result, many consumers seek protein-focused foods. To capitalize on this trend, Defendant prominently claims on the front of its Products that they are "PROTEIN PACKED" and provide "4G PLANT PROTEIN." Consumers, in turn, reasonably expect that each product will actually provide the amount of protein per serving claimed on the front of the product package in a form the body can use.

4. The Food and Drug Administration ("FDA") prohibits such front label claims about the amount of protein, unless manufacturers also provide additional information in the nutrition fact panel about how much of the recommended daily value for protein that the product will actually provide. 21 C.F.R. §§ 101.9(c)(7)(i), 101.13(b), (n). That is because the FDA recognizes that (1) when manufacturers tout an amount of protein on the front label, that amount is likely to be material to purchasing decisions, even though reasonable consumers may not know the total amount of protein they need to ingest on a daily basis, and (2) not all proteins are the same in their ability to meet human nutritional requirements, so a simple statement about the number of grams does not actually inform consumers about how much usable protein they are receiving. Some proteins are deficient in one or more of the nine amino acids essential to human protein synthesis and/or are not fully digestible within the human gut. When a human body uses up the least prevalent essential

[1] At the time of this filing, the following GFB Bites products are included in this definition: Dark Chocolate Coconut, Dark Chocolate Peanut Butter, Coconut Cashew Crunch, Chocolate Cherry Almond, Dark Chocolate Almond, and Peanut Butter. This definition is not exhaustive, and shall include all of Defendant's products that are similarly deceptively marketed.

amino acid from a food product, protein synthesis shuts down and all of the remaining amino acids from that protein source degrade mostly into waste. Likewise, whatever portion of a protein source is not digestible is similarly unavailable for protein synthesis. A protein's ability to support human nutritional requirements is known as its "quality."

5. The FDA required method for measuring protein quality is called the "Protein Digestibility Corrected Amino Acid Score"—known by its acronym PDCAAS. It combines a protein source's amino acid profile and its percent digestibility into a discount factor ranging from 0.0 to 1.0 that, when multiplied by the total protein quantity, shows how much protein in a product is actually available to support human nutritional requirements. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii). For example, a PDCAAS of .5 means that only half of the protein in that product is actually available to support human protein needs. If the product contained 10 grams total protein per serving, the corrected amount of protein would be only 5 grams per serving. As a result, protein products can vary widely in their ability to support human protein needs—even between two comparator products with the same total protein quantity.

6. Because consumers are generally unaware about the usability of various proteins, and may even be unaware of the total amount of usable protein they should ingest each day, the FDA prohibits manufacturers from advertising or promoting their products with a protein claim unless they have satisfied two requirements. First, the manufacturer must calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method. Second, the manufacturer must use the PDCAAS computation to provide "a statement of the corrected amount of protein per serving" in the nutrition facts panel ("NFP") "expressed as" a percent daily value ("%DV") and placed immediately adjacent to the statement of protein quantity. 21 C.F.R. § 101.9(c)(7)(i)-(iii). The %DV is the corrected amount of protein per serving divided by the daily reference value for protein of 50



GOOD GUSTAFSON AUMAIS LLP

grams. *Id.* Using the same example of a product containing 10 grams total protein per serving with a PDCAAS of .5, the %DV is 10% (5g/50g). Had all of the protein in the product been useful in human nutrition, the %DV would be 20% (10g/50g). The FDA regulations that govern nutrient content claims are also clear that the manufacturer may not make any front label claims about the amount of protein in the product unless it complies with these two requirements. *See* 21 C.F.R. § 101.13(b) ("A nutrient content claim[] may not be made on the label…unless the claim is made in accordance with this regulation [i.e., § 101.13]…" and (n) ("[n]utrition labeling in accordance with § 101.8…shall be provided for any food for which a nutrient content claim is made"); *accord* 58 Fed. Reg. 2302, 23310 (manufacturer can only make a "nutrient content claim…on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9.").

7. The primary protein sources in Defendant's Products are brown rice protein and pea protein.

a. The PDCAAS score for brown rice protein is .61,[2] which means Defendant's Products will provide nutritionally as little as approximately 61% of the protein quantity claimed. Nevertheless, Defendant failed to provide in the NFP a statement of the corrected amount of protein per serving calculated according to the PDCAAS methodology and expressed as a %DV.

b. The PDCAAS score for pea protein is .893,[3] which means Defendant's products will provide nutritionally as little as 89.3% of the protein quantity claimed. Nevertheless, Defendant failed to provide in the NFP

[2] Eggers, Joseph. (2022). Determining the true digestibility of plant-based proteins and their effect on obesity, NAFLD, and the gut microbiome. Retrieved from the University of Minnesota Digital Conservancy, https://hdl.handle.net/11299/250386.

[3] Rutherfurd, Shane M. et al. "Protein digestibility-corrected amino acid scores and digestible indispensable amino acid scores differentially describe protein quality in growing male rats." The Journal of nutrition 145 2 (2015): 372-9 .

a statement of the corrected amount of protein per serving calculated according to the PDCAAS methodology and expressed as a %DV.

8. Accordingly, the protein claims on the front of the package, such as "PROTEIN PACKED" and "4G PLANT PROTEIN" are unlawful in violation of parallel state and federal laws because Defendant did not comply with the regulatory requirements for making a protein claim. 21 C.F.R. § 101.9(c)(7)(i), 101.13(b), (n). The failure to include a statement of the corrected amount of protein inside the NFP also rendered the NFP itself unlawful. *Id.* § 101.9(c)(7)(i).

9. Where a product makes a protein claim, the NFP is required to contain a statement of the corrected amount of protein per serving calculated according to the PDCAAS methodology and expressed as a %DV. Accordingly, the protein claims on the front of the packages, such as "PROTEIN PACKED" and "4G PLANT PROTEIN," are unlawful in violation of parallel state and federal laws because Defendant did not comply with the regulatory requirements for making a protein claim.

10. In addition to being unlawful under 21 CFR §§ 101.9 and 101.13, Defendant's prominent protein claim on the front of the package, in the absence of any statement of the corrected amount of protein per serving expressed as a %DV in the NFP, also is likely to mislead reasonable consumers. Consumers reasonably expect that Defendant's products will actually provide nutritionally the full amount of protein per serving claimed on the front of the package and stated in the protein quantity section of the NFP. But Defendant's Products do not do so on account of their low protein quality. Had Defendant included a statement of the corrected amount of protein per serving in the NFP, as it was required to do under the law, it would have revealed that the product provides nutritionally as little as two-thirds of their total protein quantity. That information was material to reasonable consumers.

11. Additionally, Defendant's protein claim is also misleading because it is stated in the form of a quantitative amount appearing alone, without any information about protein quality. FDA regulations prohibit a manufacturer from stating "the



GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

amount or percentage of a nutrient" on the front label if it is "false or misleading in any respect." 21 C.F.R. § 101.13(i)(3). Defendant fails to disclose to consumers that the protein source in the Products (brown rice and pea protein) is low quality and only provides approximately 61% to 89.3% of the protein claimed on the label. This is misleading.

12. Defendant's unlawful and misleading protein claims caused Plaintiff and members of the class to pay a price premium for the Products.

13. Plaintiff and other reasonable consumers purchased the Products believing that they were accurately represented. Specifically, Plaintiff and reasonable consumers believed that the Products contained accurate label information and representations. Plaintiff and other reasonable consumers would not have purchased the Products if they had known about the misrepresentations and omissions, or would have purchased them on different terms.

14. Plaintiff brings this action individually and on behalf of those similarly situated and seeks to represent a California Class and a Nationwide Class. Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, restitution, other equitable relief, and disgorgement of all benefits Defendant has enjoyed from its unlawful and deceptive business practices, as detailed herein. In addition, Plaintiff seeks injunctive relief to stop Defendant's unlawful conduct in the labeling and marketing of the Products.

## PARTIES

15. Plaintiff is a citizen of California and at all times alleged in this Complaint was a resident of California. Plaintiff makes his permanent home in California and intends to remain in California.

16. Defendant is a Michigan company with its principal place of business in Grand Rapids, Michigan. Defendant produces, markets and distributes its consumer food products in retail stores across the United States including stores physically located in the State of California and in this district.

17. Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the Defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## JURISDICTION AND VENUE

18. This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the California consumer market and distributes the Products to many locations within this District and hundreds of retail locations throughout the State of California, where the Products are purchased by hundreds of consumers every day.

19. This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

20. Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff's purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

GOOD GUSTAFSON AUMAIS LLP

## DIVISIONAL ASSIGNMENT

21. Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events giving rise to the claims arose in Santa Clara County, and this action should be assigned to the San Jose Division.

## FACTUAL ALLEGATIONS

### A. Defendant Manufactures, Labels, and Advertises the Products

22. Defendant manufactures, labels, and advertises the GFB Gluten Free Bites products.

23. Defendant markets and labels the Products with the representations as described herein. While the following example shows the Dark Chocolate + Peanut Butter flavor, all of the Products contain the same representations concerning protein. Specifically, all Products contain: (1) protein content claims on the front and back of each Products' labels, (2) the claim that each product contains "XG PLANT PROTEIN" and is "PROTEIN PACKED," and (3) the omission of the Percent Daily Value for protein in the Nutrition Facts panel.

24. The number of grams of protein and the representation "protein packed" are nutrient content claims concerning protein.[4]

25. The following images display the front label, the back label, and an enlarged Nutrition Facts panel from the back label:

[4] "Packed" characterizes the level of a nutrient – protein in this case - in a product. *See Salazar v. Honest Tea, Inc.*, No. 2:13-CV-02318-KJM-EF, 2015 WL 75223, at *5 (E.D. Cal. Jan. 6, 2015) ("[T]he phrase 'our organic green tea is packed with it,' also is likely to qualify as a nutrient content claim."); Exhibit A ("The term 'packed with' characterizes the level of [nutrient] in the product; therefore, this claim is a nutrient content claim.").









**Nutrition Facts**

Serving Size 0.8 oz (24g) about 2 bites
Servings Per Container about 5

**Calories** 110 Calories from Fat 50

| **Amount/Serving** | **%Daily Value*** |
|---|---|
| **Total Fat** 5g | 8% |
| Saturated Fat 1g | 5% |
| Trans Fat 0g | |
| **Cholesterol** 0mg | 0% |
| **Sodium** 25mg | 1% |
| **Total Carbohydrate** 12g | 4% |
| Dietary Fiber 2g | 8% |
| Sugars 5g | |
| **Protein** 4g | |

Vitamin A 0% Vitamin C 0%
Calcium 2% Iron 4%

*Percent Daily Values are based on a 2,000 calorie diet

Crafted in small batches in our dedicated gluten-free facility—peanuts and tree nuts are present in our facility.

GOOD GUSTAFSON AUMAIS LLP

26. On the front label, as shown above, the Defendant prominently represents that the product is "PROTEIN PACKED" and contains "4G PLANT PROTEIN."




27. On the rear label, as shown above, the Defendant prominently represents that the product is "Protein-packed" in two locations.




28. In the Nutrition Facts panel, as shown above, the Defendant notably omits the Percent Daily Value for protein.

29. The primary sources of protein in the Products is derived from (1) brown rice protein and (2) pea protein. Both of these protein sources in the Products are incomplete proteins.

30. As described in detail below, Defendant's advertising and labeling of the Products as containing and providing specific amounts of protein per serving and use of "protein packed" is unlawful, misleading, and intended to induce consumers to purchase the Products at a premium price, while ultimately failing to meet consumer expectations. The Products' front label protein claims are unlawful because Defendant did not: (1) calculate the "corrected amount of protein per serving" based

GOOD GUSTAFSON AUMAIS LLP

on the quality of the product's protein using the PDCAAS method; and (2) provide a statement of that corrected amount of protein per serving in the NFP, expressed as %DV. 21 C.F.R. § 101.9(c)(7)(i) & (iii). The unlawful front label protein claims induced consumers to purchase the Products at a premium price. Had Defendant complied with FDA regulations and not included a protein claim on the front label of its Products and only included authorized, non-deceptive protein claims, reasonable consumers would not have purchased them or would have paid less for the Products. The front label protein claims are also false and misleading because they deceive reasonable consumers into believing that a serving of the Products will provide the grams of protein as represented on the label, when in fact, correcting for the Products' poor protein quality through PDCAAS, the amount provided will be approximately 20% less because Defendant uses proteins of low biological value to humans in its products, such as brown rice and pea derived proteins.

31. Defendant's failure to provide the required statement of the corrected amount of protein per serving, as well as Defendant's prominent front label protein claims made in the absence of any statement of the corrected amount of protein in the NFP, also deceived and misled reasonable consumers into believing that a serving of the Products will provide the grams of protein represented on the label, when that is not true. Had Defendant complied with the law, the statement of the corrected amount of protein would have revealed the Products provide significantly less protein than claimed because Defendant uses low quality protein in the Products such as brown rice and pea derived protein. The absence of this information also allowed Defendant to charge a price premium. Had reasonable consumers been informed of the true amount of protein that the products provided through a statement of the corrected amount of protein per serving, as required by FDA regulations, they would not have purchased or would have paid less for the Products.

GOOD GUSTAFSON AUMAIS LLP

**B. Importance of Protein Quality**

32. Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Indeed, the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the consumption of protein.[5]

33. Protein is found throughout the body—in muscle, bone, skin, hair, and virtually every other body part or tissue. The health benefits of protein are well studied and wide ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood pressure, reduce cholesterol, and control for risk factors for cardiovascular diseases. The National Academy of Medicine recommends that adults get a minimum of .8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[6] For a 140-pound person, that means about 50 grams of protein each day. For a 200- pound person, that means about 70 grams of protein each day.

34. Protein *quantity* by itself does not tell the full story of protein from a human nutritional standpoint. A protein's *quality* is also critical because humans cannot fully digest or utilize some proteins. Proteins are not monolithic. They are simply chains of amino acids, and different types of amino acids chained together in different ways will make different types of proteins. Further, the makeup of the protein changes the function of that protein in the body, and certain types of proteins are more easily digested and used by humans than others.

---

[5] FDA Protein Fact Sheet, https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf.

[6] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (Macronutrients) (2005).

GOOD GUSTAFSON AUMAIS LLP

35. All of a human's proteins are formed through the process of protein synthesis within their own bodies. That is, although humans consume dietary proteins, they digest those proteins, break them down into their constituent amino acids, and then use those amino acids as building blocks to synthesize the human proteins necessary for life, tissue repair, and other functions. Of the twenty total amino acids, humans can produce only eleven of them on their own. Humans cannot produce, under any circumstances, nine of the amino acids required for protein synthesis. These nine amino acids are called the "essential amino acids" and they must be supplied through the diet.

36. All nine essential amino acids are necessary for protein synthesis to take place. Lacking even one essential amino acid will prevent protein synthesis from occurring, and the rest of the proteins will degrade into waste. Accordingly, once the body uses up the limiting essential amino acid from a protein source, the remainder of that protein becomes useless to human protein synthesis and has little nutritional value. As the FDA has explicitly recognized, "[b]ecause excess amino acids are not stored in the body, humans need a constant supply of good quality dietary proteins to support growth and development." 58 Fed. Reg. 2079 at 2101. High-quality proteins, therefore, are those that contain all nine essential amino acids because they have a greater effect on protein synthesis and are fully digestible. A dietary protein containing all of the essential amino acids in the correct proportions is typically called a "complete protein."

37. A protein source's digestibility also affects the amount of useable protein a person receives from consuming it. Plant-based proteins like brown rice are approximately 60% digestible, meaning 40% of the protein from that source will simply pass through the body without ever being absorbed at all.

38. As the FDA has stated in official guidance, "Accurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56

Fed. Reg. 60366, § B. The Protein Digestibility Corrected Amino Acid Score ("PDCAAS"), is the FDA mandated measure of protein quality, and it accounts for both the amino acid profile and the digestibility of the protein. 21 C.F.R. § 101.9(c)(7)(ii).

39. The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then combine that with the proteins' digestibility into an overall discount factor (i.e., a "score" from 0.0-1.0) that represents the actual amount of protein the food provides nutritionally when multiplied by raw protein quantity. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(i).

40. Defendant uses plant-based proteins in its products. Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important. Plant based proteins typically do not contain all nine essential amino acids and are low quality to humans. Brown rice protein specifically has a PDCAAS of.61,[7] meaning only approximately 61% of the protein from those sources will be useable by humans as protein.

41. Accordingly, Defendant's use of low-quality proteins in the Products means that they actually provide far less protein to humans than the Product labels represent.

### C. <u>Defendant Violates Identical Federal and State Regulations</u>

#### a. Federal and State Regulations are Identical

42. The FDA oversees the regulation and labeling of food pursuant to the Federal Food, Drug and Cosmetic Act ("FDCA" or the "Act").

43. Identical federal and California laws regulate the content of labels on packaged food. The requirements of the Act, and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the California legislature in

---

[7] Eggers, Joseph. (2022). Determining the true digestibility of plant-based proteins and their effect on obesity, NAFLD, and the gut microbiome. Retrieved from the University of Minnesota Digital Conservancy, https://hdl.handle.net/11299/250386.



GOOD GUSTAFSON AUMAIS LLP

the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, none of the California laws sought to be enforced here imposes different requirements on the labeling of packaged food for sale in the United States.

44. The Act and the Sherman Law, provides that a food is misbranded if "its labeling is false or misleading in any particular."

**b. Regulations Governing the Labeling of Food Products**

45. 21 U.S.C. § 343 addresses misbranded food and states that a "food shall be deemed to be misbranded – (a) If (1) its labeling is false or misleading in any particular, or (2) in the case of a food to which section 350 of this title applies, its advertising is false or misleading in a material respect or its labeling is in violation of section 350(b)(2) of this title." *See* 21 U.S.C. § 343(a).

46. All Products make nutrient content claims concerning protein content.

47. On the front, each Product states "XG PLANT PROTEIN" and "PROTEIN PACKED."

48. On the back, each Product states "PROTEIN PACKED."

49. Generally, a manufacturer is not required to include the DRV for protein. However, when a product's label makes a nutrient content claim related to protein content, the manufacturer is required to include the DRV.[8]

50. The Products fail to include the Percent Daily Value for protein.

[8] 21 C.F.R. § 101.9(c)(7) and *see Guidance for Industry: A Food Labeling Guide*, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/files/food/published/Food-Labeling-Guide-%28PDF%29.pdf at N22 ("The percent of the DRV is required if a protein claim is made for the product or if the product is represented or purported to be for use by infants or children under 4 years of age.") (last visited March 20, 2022).



GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

51. By artfully omitting the DRV for protein, the Defendant is able to mislead and deceive consumers that the Products contain more usable protein than they actually receive.

52. Despite containing only inferior, incomplete proteins, consumers are misled by Defendant's marketing, labeling, and advertising to believe that the Products contain more usable protein than they receive.

**c. The Products Are Misbranded Under the Regulations Governing the Labeling of Food Products**

53. The marketing of the Products as "PROTEIN PACKED" and containing "XG PLANT PROTEIN" in prominent locations on the labels of all of the Products, throughout the Class Period, evidences Defendant's awareness that protein claims are material to consumers.

54. As described herein, the protein claims made on the Products' packaging are false and misleading.

55. "Protein Packed" characterizes the level of protein in the Product, and thus is a nutrient content claim. *See* Exhibit A, p.2 ("The term 'packed with' characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)).").

56. Further, "protein packed" is an unauthorized nutrient content claim because it is a nutrient content claim not defined by the FDA, and its use on the Products renders them misbranded. *See* Exhibit A ("The use of a term, not defined by regulation, in food labeling to characterize the level of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.").

57. The use of protein claims without including the %DV is deceptive and renders the Products misbranded.

58. In other words, "prominently advertising a product's protein quantity outside of the nutrition facts panel is misleading (within the meaning of the Food, Drug, and Cosmetic Act and the FDA's regulations), if the manufacturer doesn't

GOOD GUSTAFSON AUMAIS LLP

include the quality-adjusted percent in the nutrition facts panel." *Rausch v. Flatout, Inc.*, No. 22-CV-04157-VC, 2023 WL 2401452, at *5 (N.D. Cal. Mar. 8, 2023).

59. Thus, the Products' labels are false and misleading, and therefore the Products are misbranded.

60. To be clear, Plaintiff does not allege any claims pursuant to the FDCA and Sherman Law and relies on these regulations only to the extent they provide a predicate basis for liability under state and common law, as set forth herein.

**D. PDCAAS for Protein**

61. According to FDA regulations, "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . ***shall*** be given if a protein claim is made for the product . . ." 21 C.F.R. 101.9(c)(7)(i) (emphasis added). If a manufacturer does not want to perform PDCAAS and provide a statement of the corrected amount of protein per serving in the NFP, then it shall not make any protein claims.

62. The regulation governing nutrient content claims, section 101.13, also makes this plain. Section 101.13(n) provides that "[n]utrition labeling in accordance with § 101.9 . . . shall be provided for any food for which a nutrient content claim is made" and § 101.13(b) states "a nutrient content claim[] may not be made on the label . . . unless the claim is made in accordance with this regulation [i.e., § 101.13] . . . ." In other words, a manufacturer may not make any protein nutrient content claims on the front labels of their products unless they have complied with the requirements for protein labeling in the nutrition facts panel pursuant to section 101.9(c)(7). Indeed, the FDA made clear when promulgating § 101.13(n) that it means that a manufacturer can only make "a nutrient content claim . . . on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 01.9." 58 Fed. Reg. 2302, 23310.

GOOD GUSTAFSON AUMAIS LLP

63. Further, FDA regulations require the %DV for protein to be calculated using PDCAAS, a method that accounts for both protein quantity and protein quality. 21 C.F.R. § 101.9(c)(7)(i)-(iii); FDA Food Labeling Guide, p. 29, Question N.22.[9] The first step is to calculate the "corrected amount of protein per serving" by multiplying protein quantity by the PDCAAS quality value, and then dividing that "corrected amount" by 50 grams (the "recommended daily value" for protein) to come up with the %DV. *Id.*

64. The Products all make protein claims on the front label, but fail, uniformly to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method. The protein claims on the front are, therefore, unlawful, and were never permitted to be on the labels in the first instance under §§ 101.9(c)(7)(i), 101.13(n), and 101.13(b).

65. Defendant's failure to include a statement of the corrected amount of protein per serving expressed as a %DV in the NFP also renders the NFP itself unlawful under §§ 101.9(c)(7)(i)-(iii).

66. Defendant's use of a front-label protein claim, while failing to include the required statement of the corrected amount of protein per serving in the NFP calculated using the PDCAAS method and expressed as a %DV, is also misleading. By failing to provide it, Defendant misled consumers into believing that the Products provide a higher amount of protein than they really do. It also enabled Defendant to conceal the fact that its Products consist of low-quality proteins derived from peas that simply do not provide all of the protein that quantity alone represents. Indeed, when promulgating 21 C.F.R. § 101.9(c)(7), the FDA explained in published guidance that "Information on protein quantity alone can be misleading on foods that are of low protein quality." It also explained that it was prohibiting manufacturers from making any protein claims at all unless the manufacturer provides a statement of the

[9] Guidance for Industry: A Food Labeling Guide ("FDA Food Labeling Guide") p. 29, Question N22, U.S. Food & Drug Administration, https://www.fda.gov/media/81606/download.

GOOD GUSTAFSON AUMAIS LLP

corrected amount of protein per serving in the NFP based on PDCAAS because "nutrition labeling must allow consumers to readily identify foods with particularly low quality protein to prevent them from being misled by information on only the amount of protein present." 58 Fed. Reg. 2079 at 2101- 2.

67. Similarly, 21 C.F.R. § 101.13(i)(3) prohibits manufacturers from making a claim on the front of a product's package about the "amount or percentage of a nutrient," such as protein, if the statement is "false or misleading in any respect." If it is, then "it may not be made on the label." 21 C.F.R. § 101.13(b). This is true even if the same amount appears in the nutrition facts panel. 21 C.F.R. § 101.13(c). Since the omission of the %DV from the nutrition facts panel rendered the front label protein claim misleading, the protein claim was not permitted to be on the front label.

68. Under the Act, the term false has its usual meaning of "untruthful," while the term misleading is a term of art that covers labels that are technically true, but are likely to deceive consumers.

69. The FDA explained in promulgating section 101.13(i) that the regulation was necessary "since many consumers have a limited knowledge and understanding of the amounts of nutrients that are recommended for daily consumption," which means that "a statement declaring that the product contained a specified amount of a nutrient could be misleading. By its very presence, such a statement could give consumers who were unfamiliar with the dietary recommendations the false impression that the product would assist them in maintaining healthy dietary practices relative to the amount of the nutrient consumed when it, in fact, would not." 56 Fed. Reg. 60421. The rules are different for amounts in the NFP and nutrient content claims because a voluntary nutrient declaration on the front panel "is viewed by the agency as an effort to market the food as a significant source of nutrients." 56 Fed. Reg. 60366.

70. In addition to regulating the NFP, the FDA has promulgated a separate set of regulations that govern nutrient content claims on the front of a package. 21

C.F.R. § 101.13. A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement outside the Nutrition Facts Panel, about the level of a nutrient. 21 C.F.R. 101.13(b)(1); 21 C.F.R. § 101.13(c). Stating information from the nutrition facts panel (such as grams protein per serving) elsewhere on the package necessarily constitutes a nutrient content claim. 21 C.F.R. § 101.13(c). A manufacturer cannot make a nutrient content claim in the form of a "statement about the amount or percentage of a nutrient" if the statement is "false or misleading in any respect." 21 C.F.R. 101.13(i)(3).

71. While a required statement *inside* of the NFP escapes regulations reserved for nutrient content claims (21 C.F.R. § 101.13(c)), the identical statement *outside* of the NFP is still considered a nutrient content claim and is therefore subject to 21 C.F.R. § 101.13(i)(3). 21 C.F.R. § 101.13(c). Indeed, the Ninth Circuit has specifically held that "a requirement to state certain facts in the nutrition label is not a license to make that statement elsewhere on the product." *Reid v. Johnson & Johnson*, 780 F.3d 952, 960 (9th Cir. 2015). Thus, Defendant's quantitative protein claims on the front label are subject to analysis as a nutrient content claim and cannot be false or misleading in any manner.

72. Defendant's protein representations on the front package are misleading because they broadly tout protein quantity alone while ignoring that the poor-quality proteins in the Products will provide far less useable protein than claimed. The claim on the front is therefore separately misleading and should never have appeared on the package.

73. Defendant's Products are unlawful, misbranded, and violate the Sherman Law, California Health & Safety Code § 110660, et seq. Defendant makes protein content claims on the front of its Product packages even though it uniformly fails to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method and expressed as a %DV as required by

21 C.F.R. § 101.9(c)(7)(i). Defendant's failure to comply with this requirement render its front label protein claim unlawful per se and the product misbranded pursuant to § 101.13(n) and (b), as well as under § 101.9(c)(7)(i) itself. Defendant's omission of the %DV from the NFP despite the fact that it makes front label protein claims is also unlawful and in violation of § 101.9(c)(7)(i)-(iii).

74. Defendant's standalone, front label protein quantity claim is also misleading, and therefore prohibited by sections 101.13(i)(3), (b), and (n) due to Defendant's failure to include a statement of the corrected amount of protein per serving in the NFP calculated using the PDCAAS method and expressed as a %DV. Consumers have a "limited knowledge and understanding of the amount of [protein] that [is] recommended for daily consumption," let alone an understanding of the science behind protein quality and how different types of proteins are used and absorbed in the body. 56 Fed. Reg. 60421. The FDA requires a statement of the corrected amount of protein per serving in the NFP precisely to ensure that "consumers are not misled by information on only the amount of protein present" in a product with low quality protein. 58 Fed. Reg. 2079 at 2101-2. Defendant's failure to provide it rendered the label misleading. Further, the front label is also misleading because it states that it provides 4g protein, when, in fact, after adjusting the protein content based on PDCAAS, the Products will provide less than 80% of that much protein.

**E. The Products' Labeling Violates Federal and State Regulations**

75. Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, et. seq.), including but not limited to:

a. Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));



GOOD GUSTAFSON AUMAIS LLP

b. Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

c. Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

d. Section 110765, which makes it unlawful for any person to misbrand any food; and

e. Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

76. Defendant's marketing, advertising, and sale of the Products also violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, et. seq.), including, but not limited to:

a. Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

b. Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

c. Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

77. Defendant has violated the Act, and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.9 (c)(7), 21 C.F.R. § 101.13(i)(3), (b), (n), 21 C.F.R. § 101.9(h)(d), and 21 C.F.R. 101.9(e)(3) which have been incorporated by reference in the Sherman Law, by failing to include on the Product labels the nutritional information required by law.

78. A reasonable consumer would expect that the Products provide what Defendant identifies them to provide on the product labels and that the labels would not be contrary to the policies or regulations of the State of California and/or the FDA. For example, a reasonable consumer would expect that when Defendant labels its Products as containing "4G PLANT PROTEIN," as Defendant claims on the Product, it would provide 4 grams of protein per serving in a form their bodies could use. Because Defendant did not conduct PDCAAS and provide a statement of the corrected amount of protein per serving, expressed as a %DV, consumers have no idea that the Products provide significantly less protein.

79. Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. Reasonable consumers, when they look at the front label of the Products, believe the Products provide the amount of protein represented on the front label. Because Defendant does not include any information as to the quality of the protein anywhere on the packaging, even though it was legally required to do so via the statement of corrected amount of protein expressed as a %DV, consumers do not have any reason to think otherwise. Reasonable consumers do not walk around with the PDCAAS values for various protein sources in their heads. They would not know the true amount of protein the Products provide nutritionally merely by looking elsewhere on the product package. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that a serving of a Product does not provide the number of grams of protein that is represented on the label. An average consumer also lacks the specialized knowledge necessary to determine the PDCAAS for the Products. The average reasonable consumer had no reason to suspect that Defendant's representations on the packages were misleading. Therefore, consumers had no reason to investigate whether the Products actually do provide the amount of protein

GOOD GUSTAFSON AUMAIS LLP

per serving that the labels claim they do and reasonably relied on Defendant's representations regarding the nature of the Products.

80. Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done with the claims on the Products that they contain and provide specific amounts of protein per serving.

**F. Defendant Misleadingly Markets the Products to Increase Profits and Gain a Competitive Edge**

81. In making unlawful, false, misleading, and deceptive representations, Defendant distinguishes the Products from its competitors' products. Defendant knew and intended that consumers would purchase, and pay a premium for, products labeled with protein claims. By using this marketing strategy, Defendant is stating that the Products are superior to, better than, and more nutritious and healthful than other products that do not make protein claims, or that do not make protein claims based on poorly-disclosed added ingredients, or that properly provide the required statement of the corrected amount of protein in the product as determined by the PDCAAS method and express as a %DV and otherwise do not mislead consumers about the amount of protein their products actually provide.

**G. Defendant Intends to Continue to Market the Products as Containing More Protein than the Products Actually Contain**

82. Consumers are focused on increasing the amount of protein in their diets. This increased demand indicates that consumers are willing to pay a premium for products that contain protein claims.[10]

[10] *See* Brooks, Robert & Simpson, S.J. & Raubenheimer, David. (2010). *The price of protein: Combining evolutionary and economic analysis to understand excessive energy consumption.* Obesity Reviews : an official journal of the International Association for the Study of Obesity. 11. 887-94. 10.1111/j.1467-789X.2010.00733.x.

83. Because consumers pay a price premium for products that make protein claims, and also pay a premium for products that provide, or purport to provide, more protein, by labeling its Products with protein claims and/or omitting the required statement of the corrected amount of protein per serving, Defendant is able to both increase its sales and retain more profits.

84. Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors that do not misrepresent the number of grams of protein contained in its products, and/or (ii) commanding a higher price for its Products because consumers will pay more for the Products due to consumers' demand for products with protein claims.

85. The market for protein-focused products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the levels of protein and the number of grams of protein in food products, Defendant has an incentive to continue to make such unlawful and misleading representations. In addition, other trends suggest that Defendant has no incentive to change its labeling practices.

86. For example, one market analysis revealed that between 2013-2017, product launches with a protein claim grew 31%.[11]

87. To capitalize on the growing market, Defendant continues to launch new product lines and flavors to diversify its portfolio to maintain its competitive edge. It is therefore likely that Defendant will continue to unlawfully and/or misleadingly advertise the Products and perpetuate the misrepresentations regarding the protein in the Products.

[11] Gil Hyslop, *10 Key Snack Trends to Watch*, BAKERYANDSNACKS.COM (Sep. 28, 2021), https://www.bakeryandsnacks.com/Article/2018/11/26/10-key-snack-trends-to-watch.



GOOD GUSTAFSON AUMAIS LLP

**H. Plaintiff's Experiences**

88. Plaintiff purchased the Products during the class period, as described herein. Plaintiff's claim is typical of all Class Members in this regard. In addition, the advertising and labeling on the package of the Products purchased by Plaintiff, including the representations, is typical of the advertising and labeling of the Products purchased by members of the Class. In May 2020, Plaintiff purchased Defendant's Dark Chocolate + Peanut Butter Gluten Free Bites at a price of $4.99 per bag from a CVS store located in San Jose, CA.

89. Plaintiff made his purchase after reading and relying on the truthfulness of Defendant's front labels that promised the Products were protein packed and provided 4 grams of protein. He believed the truth of each representation, i.e., that the product contained a "packed" amount of protein and would actually provide the specific amount of protein claimed on the front labels in a form human bodies could utilize. He relied on the Products to meet his protein dietary needs. Had Defendant complied with the law and not made the protein claims on the front of its packages, he would not have been drawn to the Products and would not have purchased them. At a minimum, Plaintiff would have paid less for each Product.

90. Moreover, had Defendant adequately disclosed the corrected amount of protein per serving for each Product expressed as a %DV, as FDA regulations require, Plaintiff would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff regularly checks the NFP before purchasing any product for the first time, including the %DV column for protein when manufacturers provide it, and he uses that information as a basis of comparison between similar products. He looked at and read the NFP on the Product before purchasing it for the first time. Manufacturers do not always disclose a %DV for protein, but when they do, he selects the product that provides more of the recommend daily amount of protein (i.e., the one with a higher %DV). When a manufacturer does not provide a %DV for protein,

he can only go off of the stated grams of protein and other protein claims, and he assumes that all of those disclosed grams are in a form his body can use as protein.

91. For example, with the Product, Plaintiff was looking for a product that would provide a "packed" amount of protein and 4 grams of useable protein per serving. Had he seen that the Product provided only approximately 6% (or less) of the daily value for protein, i.e., only approximately 3.2 grams or less corrected amount of protein per serving, he would not have purchased the Products or, at a minimum, he would have paid less for them. Plaintiff would also have used the information as a basis to compare similar products and would have chosen instead to purchase one with a higher %DV. Without the statement of the corrected amount of protein per serving in the form of a %DV, the only information Plaintiff had about the Products was that it was "packed" with the 4 gram protein quantity, and he believed he was receiving the full amount of that quantity in a form human bodies could use. Because the Products did not provide any statement of the corrected amount of protein per serving, Plaintiff did not have any reason to believe that the Products provided less protein than the amount represented on the front of the label. Plaintiff did in fact believe he was receiving 4 grams of high-quality protein when he purchased the Products.

92. Plaintiff continues to desire to purchase protein products, including those marketed and sold by Defendant, and would like to purchase products that provide 4 grams of protein per serving. If the Products were reformulated to provide, in a usable form, the grams of protein that are represented on the labels, or the labels were reformulated to provide nonmisleading information, Plaintiff would likely purchase them again in the future. Plaintiff regularly visits stores where the Products and other protein products are sold. Because Plaintiff does not know the formula for Defendant's products, which can change over time, and cannot test whether the Products provide the amount of digestible protein that is represented on the label without first purchasing the Product, Plaintiff will be unable to rely on

GOOD GUSTAFSON AUMAIS LLP

Defendant's labels when shopping for protein products in the future absent an injunction that prohibits Defendant from mislabeling its Products. Plaintiff would also be forced to retest and/or reanalyze each Product at each time of purchase because a Product's ingredient list and labeling would not reveal any changes in the amount of digestible protein, even if such changes took place. In addition, at present Plaintiff cannot rely on the accuracy of Defendant's labels for the entire line of Products, which Plaintiff is also interested in purchasing with labeling that comports with regulations. Should Defendant begin to market and sell a new line of products, Plaintiff could also be at risk for buying another one of Defendant's products in reliance on the same or similar misrepresentation and omissions. And because of Defendant's unlawful and misleading labels on its Products, Plaintiff cannot make informed choices between protein products offered by Defendant and protein products offered by other manufacturers, such as choices based on price and relative nutritional content.

93. Plaintiff and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under state law and the products are misbranded; therefore, the Products are worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

94. Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

95. Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled the Plaintiff and the Class Members.

96. In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay

GOOD GUSTAFSON AUMAIS LLP

a premium for Products containing protein claims over comparable products not so labeled.

97. As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured the Plaintiff and the Class Members in that they:

a. Paid a sum of money for Products that were not what Defendant represented;
b. Paid a premium price for Products that were not what Defendant represented;
c. Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and
d. Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

98. Had Defendant not made the false, unlawful, unfair, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

99. Plaintiff and the Class Members paid for Products that contained less usable protein than represented on the Product's packaging. The products Plaintiff and the Class Members received were worth less than the Products for which they paid.

100. Based on Defendant's misleading and deceptive representations, Defendant was able to, and did, charge a premium price for the Products over the cost of competitive products that did not make protein claims.

101. Plaintiff and the Class Members all paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff

and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

## CLASS DEFINITIONS AND ALLEGATIONS

102. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself, on behalf of all others similarly situated, and as a member of the classes defined as follows (collectively, the "Class" or "Classes"):

1. All citizens of California who, within the relevant statute of limitation periods, purchased Defendant's Products ("California Class");
2. All citizens of the United States who, within the relevant statute of limitations periods, purchased Defendant's Products ("Nationwide Class").

103. Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

104. The members of the Class are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, tens of thousands of units of the Products to Class Members.

105. Common Questions Predominate: This action involves common questions of law and fact to the potential Classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products contained the amount of protein as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will



GOOD GUSTAFSON AUMAIS LLP

establish the right of each member of the Classes to recover. The questions of law and fact common to the Classes are:

a. What is the PDCAAS for the protein in the Products;

b. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are unlawful and/or misleading;

c. Whether Defendant's actions violate Federal and California laws invoked herein;

d. Whether labeling the Products with a protein claim causes the Products to command a price premium in the market;

e. Whether Defendant's failure to provide a statement of the corrected amount of protein per serving in the Products sold to the Classes was likely to deceive reasonable consumers;

f. Whether representations regarding the number of grams of protein in the Products are material to a reasonable consumer;

g. Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

h. The amount of profits and revenues Defendant earned as a result of the conduct;

i. Whether Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j. Whether Class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

106. Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the classes, purchased Defendant's Products bearing the protein representations and Plaintiff sustained damages from Defendant's wrongful conduct described herein.

107. Plaintiff will fairly and adequately protect the interests of the classes and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the classes.

108. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

109. The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

110. The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

**CAUSES OF ACTION**

Plaintiff does not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiff relies on the

FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

**FIRST CAUSE OF ACTION**

**Violations of the Unfair Competition Law ("UCL"),**

**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**

111. Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

112. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

113. Defendant's misrepresentations of material facts, as set forth herein, also constitute an "unlawful" practice because they violate California Civil Code §§ 1572, 1573, 1709, 1710, 1711, and 1770 and the laws and regulations cited herein, as well as the common law.

114. In particular, Defendant has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), et seq. and FDA regulations, including but not limited to 21 C.F.R. 21 C.F.R. § 101.9 (c)(7), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

115. Defendant's conduct constitutes an unfair business act and practice pursuant to California Business & Professions Code §§ 17200, *et seq*. (the "UCL"). The



GOOD GUSTAFSON AUMAIS LLP

UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

116. Defendant's knowing conduct, as alleged herein, constitutes an "unfair" and/or "fraudulent" business practice, as set forth in California Business & Professions Code §§ 17200-17208.

117. In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) unlawfully making a protein claim on the front of the package without complying with the regulatory requirements for making a protein claim set forth in 21 C.F.R. § 101.9(c)(7)(i)-(iii) and incorporated by reference by California's Sherman law; (ii) failing to provide a statement of the corrected amount of protein per serving in the NFP, calculated according to the PDCAAS method and expressed as a %DV, as required by FDA regulations; (iii) using unauthorized nutrient content claims ("protein packed"); and (iv) misleading reasonable consumers regarding the amount of protein the Products provide nutritionally in a form that humans can use.

118. Plaintiff and those similarly situated relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

119. Defendant's acts and omissions are likely to deceive the general public.

120. Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code.

121. The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an



GOOD GUSTAFSON AUMAIS LLP

unlawful advantage over Defendant's competitors as well as injury to the general public.

122. As a direct and proximate result of such actions, Plaintiff and the other California Class Members have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and the California Class Members lost the amount they paid for the Products.

123. As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

124. Defendant is aware that the representations and omissions they have made about the Products were and continue to be false and misleading.

125. Defendant had an improper motive—to derive financial gain at the expense of accuracy or truthfulness—in its practices related to the labeling and advertising of the Products.

126. There were reasonable alternatives available to Defendant to further its legitimate business interests, other than the conduct described herein.

127. Defendant's conduct in making the representations and omissions described herein constitutes a knowing failure to adopt policies in accordance with and adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct creates an unfair competitive advantage for Defendant, thereby constituting an unfair business practice under California Business & Professions Code §§ 17200-17208.

128. In addition, Defendant's conduct was, and continues to be, unfair in that its injury to countless purchasers of the Products is substantial, and is not outweighed by any countervailing benefits to consumers or to competitors.

129. Moreover, Plaintiff and members of the California Class could not have reasonably avoided such injury. Defendant's material misrepresentations and omissions regarding the Products were likely to deceive, and Defendant knew or should have known that its misrepresentations and omissions were untrue and misleading. Plaintiff purchased the Products in reliance on the representations made by Defendant, including that the Products' labeling was accurate as alleged herein, and without knowledge of Defendant's misrepresentations and omissions.

130. Plaintiff and members of the California Class have been directly and proximately injured by Defendant's conduct in ways including, but not limited to, the monies paid to Defendant for the Products, interest lost on those monies, and consumers' unwitting support of a business enterprise that promotes deception and undue greed to the detriment of consumers, such as Plaintiff and members of the California Class.

131. As a result of the business acts and practices described above, Plaintiff and members of the California Class, pursuant to § 17203, are entitled to an Order enjoining such future wrongful conduct on the part of Defendant and such other Orders and judgments that may be necessary to disgorge Defendant's ill-gotten gains and to restore to any person in interest any money paid for the Products as a result of the wrongful conduct of Defendant.

132. Pursuant to Civil Code § 3287(a), Plaintiff and the members of the California Class are further entitled to pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the class members are entitled to interest in an amount according to proof.

**SECOND CAUSE OF ACTION**

**Violations of the False Advertising Law ("FAL"),**

**Cal. Bus. & Prof. Code §§ 17500 *et seq*.**

133. Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

134. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

135. California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

136. Defendant made representations and statements (by omission and commission) that led reasonable customers to believe that the Products that they were purchasing contained more grams of protein per serving than the Products actually provided, and that the Products were appropriate for meeting protein dietary needs. Defendant had a duty to disclose the corrected amount of protein per serving in the NFP, as calculated according to the PDCAAS method, which Defendant failed to do.

137. Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing Defendant's Products or paying less for them.

138. Defendant's acts and omissions are likely to deceive the general public.

GOOD GUSTAFSON AUMAIS LLP

139. Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, et seq. of the California Business and Professions Code.

140. The aforementioned practices, which Defendant used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public. 91. As a direct and proximate result of such actions, Plaintiff and the other members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

141. Plaintiff seeks, on behalf of himself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

142. Plaintiff seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

143. Plaintiff seeks, on behalf of himself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal

redress in order to recover monies paid to Defendant to which it is not entitled. Plaintiff, those similarly situated, and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**THIRD CAUSE OF ACTION**

**Violations of the Consumer Legal Remedies Act ("CLRA"),**

**Cal. Civ. Code §§ 1750 *et seq*.**

144. Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

145. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

146. Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

147. At all times relevant hereto, Plaintiff and members of the California Class were "consumer[s]," as defined in Civil Code section 1761(d).

148. At all times relevant hereto, Defendant constituted a "person," as defined in Civil Code section 1761(c).

149. At all times relevant hereto, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in Civil Code section 1761(a).

150. The purchases of the Products by Plaintiff and members of the California Class were and are "transactions" within the meaning of Civil Code section 1761(e).

151. Defendant's acts and practices, set forth in this Class Action Complaint, led customers to falsely believe that the Products provided nutritionally the amount of protein claimed on the product package. By engaging in the actions,



GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

representations and conduct set forth in this Class Action Complaint, Defendant has violated, and continues to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendant's acts and practices constitute improper representations that the goods it sells have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendant's acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendant deceptively markets and advertises that, unlike other protein product manufacturers, it sells Products that provide more grams of protein than the Products actually do. In violation of California Civil Code §1770(a)(9), Defendant has advertised goods or services with intent not to sell them as advertised. Finally, Defendant had a duty to disclose the corrected amount of protein per serving in the NFP as calculated by the PDCAAS method, which Defendant failed to do. 21 C.F.R. § 101.9(c)(7)(i)-(iii).

152. Plaintiff requests that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiff and the other members of the California Class will continue to suffer harm. Plaintiff and those similarly situated have no adequate remedy at law to stop Defendant's continuing practices.

153. On March 22, 2022, pursuant to the provisions of Cal. Civ. Code § 1782(a), Defendant was provided with notice and a demand to correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify consumers, notify them of

their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiff seeks, pursuant to California Civil Code § 1780(a)(3), on behalf of himself and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

154. Pursuant to California Civil Code § 1780, Plaintiff seeks injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper.

155. Defendant knew or should have known that its Products did not contain the claimed characteristics because Defendant manufactured, marketed and sold its Products without those characteristics that it claimed. Defendant knew or should have known that its representations about its products as described herein violated consumer protection laws, and that these statements would be relied upon by Plaintiff and members of the California Class.

156. Defendant's actions as described herein were done with conscious disregard of Plaintiff's and California Class Members' rights and was wanton and malicious.

**FOURTH CAUSE OF ACTION**

**Unjust Enrichment**

157. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

158. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against the Defendant.

159. At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the Class.

160. Plaintiff and members of the Class conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing. Defendant accepted or retained the

GOOD GUSTAFSON AUMAIS LLP

nongratuitous benefits conferred by Plaintiff and members of the Class, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and members of the Class were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

161. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

162. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Class for its unjust enrichment, as ordered by the Court.

**RELIEF DEMANDED**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

b. For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c. For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Classes for all causes of action;

d. For an order requiring Defendant to immediately cease and desist from selling their misbranded Products in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e. For prejudgment and postjudgment interest on all amounts awarded;

f. For an order awarding punitive damages; and

g. For an order awarding attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: May 1, 2023

Respectfully submitted,

By: /s/ *Steffan T. Keeton*

Steffan T. Keeton*
**THE KEETON FIRM LLC**
100 S Commons, Suite 102
Pittsburgh, PA 15212
Telephone: (888) 412-5291
stkeeton@keetonfirm.com
**pro hac vice*

J. Ryan Gustafson (SBN 220802)
**Good Gustafson Aumais LLP**
2330 Westwood Blvd., No. 103
Los Angeles, California 90064
Telephone: (310) 274-4663
jrg@ggallp.com

*Counsel for Plaintiff and the Class*